HON. _____

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CAREY M. BRENNAN, | NO. |
| Plaintiff, | COMPLAINT |
| vs. | |
| OPUS BANK, a California corporation; and STEPHEN H. GORDON, | **JURY TRIAL DEMAND** |
| Defendants. | |

COMES NOW Plaintiff CAREY M. BRENNAN, by and through his attorney of record, Michael D. Hunsinger of The Hunsinger Law Firm, and alleges as follows:

**I. PARTIES**

1.1    Plaintiff Carey M. Brennan ("Brennan") is and at all material times hereto has been, a resident of King County, Washington.

1.2    Defendant Opus Bank ("Opus" or "the Bank") is a California-chartered commercial bank and the successor by way of change of name to Bay Cities National Bank. Opus is registered to do business, and is doing business, in the State of Washington.

1.3    Stephen H. Gordon ("Gordon") is a resident of the State of California.  He is

COMPLAINT
PAGE 1

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Chairman of the Board of Directors, President and Chief Executive Officer ("CEO") of the Bank.

## II.  JURISDICTION AND VENUE

2.1     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §1121 and 28 U.S.C. §§ 1331, 1338(a), (b), and 1367(a).

2.2     This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §1332(a) because the suit is between citizens of different States and the amount in controversy exceeds $75,000, excluding interest and costs.

2.3     This Court has personal jurisdiction over the Defendants in accordance with Washington Revised Code §4.28.080(10) because the Bank, and Gordon as its CEO, carry on substantial and continuous business activities in the State of Washington, and within this district by, among other activities, operating bank branches in King, Snohomish, and Skagit Counties.

2.4     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this district and because the Defendants are subject to the Court's personal jurisdiction in Washington and would be subject to personal jurisdiction in this district if this district were a State.

## III.  FACTS

### Backgrounds of Gordon and Brennan and How They Met

3.1     Brennan is an attorney.  Between 1984 and 2001 – except for two years in the mid-1980's – Brennan was a partner in the international law firm of Jones Day, where he assisted some of the firm's largest financial institution clients on a variety of general corporate finance and mergers and acquisition matters.

3.2     Beginning in 2001, Brennan was employed by Washington Mutual Bank ("WAMU") as its Senior Vice President, Deputy Chief Legal Officer, and General Counsel

COMPLAINT
PAGE 2

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

– Capital Markets.  While at WAMU, Brennan oversaw all corporate, corporate finance, securities, and mergers and acquisitions related legal matters.  During his tenure at WAMU, Brennan acted as senior legal advisor on all merger and acquisition related matters of the company, including several multi-billion dollar transactions.  Brennan also handled several significant corporate finance transactions, including private placements and public offerings totaling over $10 billion.

      3.3     Gordon began his business career on Wall Street as an investment banker and bond trader, where he joined a newly formed investment banking firm named Sandler O'Neill & Partners, L.P. ("Sandler O'Neill") in 1988 and became a partner in 1992.  He left Sandler O'Neill in 1995 to move to Southern California to start his own investment and financial institution businesses, which became the foundation for Commercial Capital Bancorp, Inc. ("CCB").

      3.4     Gordon formed CCB as a Nevada corporation in December 2000 to become the holding company for the financial institution businesses that Gordon had founded starting in April 1998.  Gordon was the principal shareholder, Chairman of the Board of Directors, and CEO of CCB at the time of its formation.  In December 2002, CCB completed the sale of approximately 5,000,000 shares of its common stock in an initial public offering ("IPO") of securities underwritten by Sandler O'Neill and Friedman Billings Ramsey.  Gordon remained a significant shareholder, Chairman of the Board of Directors, and CEO of CCB after the IPO.  Gordon's Employment Agreement with CCB dated September 13, 2001 (the "Gordon/CCB Employment Agreement") was an exhibit to the registration statement filed with the Securities & Exchange Commission ("SEC") for the IPO.

      3.5     In early-April 2006, after learning that another financial institution was actively engaged in discussions with Gordon to acquire CCB, WAMU expressed interest in

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

acquiring CCB, which WAMU viewed as a mono-line originator of multifamily loans, principally in the California market. A large team from WAMU, including Brennan, commenced a thorough due diligence review of CCB's books and records and loan portfolio. During this review, Brennan identified significant and concerning ambiguities in the Gordon/CCB Employment Agreement, provisions that were replicated in the employment agreements with other CCB executive officers. Based at least in part on Brennan's analysis, WAMU decided to proceed with the proposed acquisition of CCB, and the parties announced the transaction on April 23, 2006.

3.6     During the process of obtaining approvals for the acquisition from WAMU's bank regulator, the Office of Thrift Supervision ("OTS"), and from CCB's shareholders, and while planning the transaction's completion and integration, Brennan (on behalf of WAMU) and Gordon (on behalf of CCB) had frequent contact on significant matters affecting the transaction, including issues pertaining to the Gordon/CCB Employment Agreement. It was also during this time that Brennan met Don Royer ("Royer"), the then general counsel of CCB, with whom Brennan interacted extensively.

3.7     WAMU's acquisition of CCB closed on October 1, 2006. CCB's financial advisers for the WAMU acquisition were Sandler O'Neill and Credit Suisse USA, L.P. ("Credit Suisse"), and the law firm of Patton Boggs, LLP ("Patton Boggs") acted as outside corporate legal counsel.

3.8     Gordon retired after the sale of CCB to WAMU until he began serving as Chairman of the Board and CEO of Fremont General Corporation and its subsidiary, Fremont General Investment and Loan (collectively "Fremont"), in November 2007. On two occasions during 2007, Gordon turned to Brennan to request that WAMU waive the enforcement of the three-year non-competition provision Gordon agreed to when he sold CCB to WAMU. Gordon made these requests of Brennan to be able to pursue his new

COMPLAINT
PAGE 4

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

business initiatives, including becoming Chairman and CEO at Fremont, which were barred by the non-competition provision.  In each instance, WAMU granted the waiver.

### The Creation of Opus Bank

3.9     In May or June of 2008, Gordon initiated discussions with Brennan about leaving WAMU to join Gordon and other former CCB executives who had a vision to raise hundreds of millions of dollars of private capital to acquire banks, principally failed banks with the assistance of the Federal Deposit Insurance Corporation ("FDIC"), throughout the Western United States.  Gordon described to Brennan his intent to create a new super regional community bank with diversified business lines and loan products, far different from CCB, which primarily originated multifamily loans in California.  Brennan concluded that Gordon's vision was timely because serious deterioration in the financial condition and performance of banking institutions throughout the West was likely to create the opportunity to acquire failed banks having sizeable deposit franchises with financial assistance from the FDIC.  He told Gordon that he was interested and they talked periodically thereafter about Gordon's plans.

3.10     On September 25, 2008, the OTS seized WAMU and appointed the FDIC as receiver, which promptly sold the assets to JP Morgan Chase Bank, N.A. ("Chase").  Brennan immediately began working for Chase as a Senior Vice President reporting to Chase's General Counsel.  He left Chase in July 2009 and formed 60th Street Advisors, L.L.C. to, among other endeavors, join Gordon's efforts to launch his new banking enterprise.

3.11     In early August 2009 Gordon identified Bay Cities National Bank of Redondo Beach, California ("Bay Cities") as a potentially suitable banking platform from which to launch his vision for a diversified super regional community bank.  Bay Cities was a small commercial bank that operated five branches in the South Bay communities of Los

COMPLAINT
PAGE 5

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Angeles County, with 56 employees, $290 million in total assets, $147 million in net loans (virtually none of which were delinquent), and $240 million in total deposits as of June 30, 2009.  Bay Cities had deteriorated into a "troubled condition" for bank regulatory purposes as a result of a failed securities investment strategy that caused significant investment losses and diminished capital.

3.12    From August through December 2009, Gordon and Brennan worked to complete their due diligence review and analysis of Bay Cities' books and records and loan and securities portfolios, to negotiate with Bay Cities' current owners mutually agreeable terms for a Gordon-led investment group to acquire Bay Cities, and to begin efforts to raise the hundreds of millions of dollars of new capital that would be required to pursue Gordon's vision and strategy.   Potential investors were provided with a confidential document entitled "Recapitalization and Expansion of Bay Cities National Bank" that set forth the terms of the proposed transaction with Bay Cities, proposed terms for the capital raise, and outlined basic information concerning the background and experience of Gordon and the other members of the anticipated new management team and their future plans for Bay Cities.

3.13    Definitive agreements to acquire Bay Cities were signed on December 17, 2009, at which time Gordon and Brennan began in earnest their capital-raising efforts. They worked side-by-side for ten months to ultimately raise $460 million to complete the acquisition and recapitalization of Bay Cities (the "Bay Cities Transaction") through the sale of Bay Cities' common and preferred stock in an exempt offering to institutional and other accredited investors (the "2010 Offering").  They were assisted by a small group of other former CCB employees, all of whom were employed full-time, mostly with Fremont, and could devote only limited time to the Bay Cities Transaction and the 2010 Offering. During this period, Gordon did not pay Brennan for the substantial work he performed and

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

did not reimburse him for the substantial travel and other business expenses he incurred. Rather, Brennan relied upon the promises Gordon made him concerning his future employment with the Bank, including substantial grants of equity and responsibility if they were able to successfully complete the 2010 Offering and the Bay Cities Transaction.

3.14    Gordon hired Sandler O'Neill and Credit Suisse as placement agents for the 2010 Offering and Patton Boggs as corporate counsel for the Bay Cities Transaction.

3.15    In February 2010, in satisfaction of the requirements for his application to obtain bank regulatory approval for the proposed Bay Cities Transaction, Gordon presented a business plan to the California Department of Financial Institutions ("DFI") and the FDIC for their review and non-objection.  This narrative plan ("the Acquisition Business Plan") reflected substantial input from Brennan and, while Gordon had given Brennan a very rough draft of the plan at the start, Brennan almost entirely rewrote the final draft.

3.16    Brennan also oversaw the drafting of an 87-page private placement memorandum ("the 2010 PPM") that, together with the Acquisition Business Plan and other documents, constituted the offering materials for the 2010 Offering.  The Acquisition Business Plan and the 2010 PPM were made available, including by means of an electronic data room, to and for review by persons who expressed interest in purchasing securities in the 2010 Offering.  Along with Gordon and the placement agents, Brennan was involved extensively in the negotiation of the final terms for the purchase of securities by the institutional investors who committed to purchase the largest percentages of Bay Cities' stock in the 2010 Offering (the "Key Investors").

3.17    As stated in the 2010 PPM, the strategy of the Bank's management team (including Brennan as the proposed Executive Vice President and Head of Corporate Development) was:

COMPLAINT
PAGE 7

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

. . . to raise a substantial amount of capital through the Offering to execute a business plan focused on the development and growth of a regional bank with a strong retail and commercial banking platform located in the "Western region," defined as California, Arizona, Nevada, Oregon and Washington.  Upon completion of the Offering we will, under the direction of our new management team, implement a program focusing on organic growth, including growth of deposits, loans, fee income, de novo locations and lines of business.  We will also immediately seek to opportunistically acquire the assets and/or assume the deposits of failed or distressed depository institutions through transactions assisted by the FDIC, as well as to acquire distressed assets and whole banks in non-assisted deals.  In addition, we expect to further develop our franchise by achieving operational efficiency through the successful integration of acquisitions and establishment of underwriting standards focused on maintaining strong credit quality for our balance sheet.

3.18    The business plan referred to in the 2010 PPM was the Acquisition Business Plan, which described the growth strategy and projected financial performance and results for the Bank from January 1, 2010 through December 31, 2012, following completion of the Bay Cities Transaction, as well as the steps for completing the Bay Cities Transaction. Over the course of the three-year plan period, the Bank projected that it would grow from its then current asset size of approximately $281 million to $11.9 billion in total assets, then to around $16 billion within the following two years.  The Acquisition Business Plan stated that these financial projections were based on a five-year financial model that "***depicts events, outcomes and results we believe we will most likely achieve***" (emphasis added), stating further:

The model assumes (i) a $400 million capital infusion (net of expenses) contemporaneously with the closing of the Recapitalization, (ii) acquisitions of failed banks from the FDIC during [the] first 18 months of the plan, and (iii) two subsequent capital raises on the first and second anniversaries

COMPLAINT
PAGE 8

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

of the Recapitalization, resulting in net proceeds of approximately $340 million and $120 million, respectively. We expect the second capital raise will be another private placement of securities, with significant participation by investors acquiring securities in the Recapitalization. We expect the third capital raise will be an initial public offering of the Bank's common stock.

. . .

Assumptions in the financial model for acquisitions of failed banks from the FDIC are:

- FDIC-assisted acquisitions will occur in the second and fourth quarters of Year 1 and the second quarter of Year 2.

- In each of these quarters, the Bank will assume $2.5 billion of deposit liabilities from the FDIC as receiver for the failed banks . . .

- In each of the quarters, the Bank will acquire $1.75 billion of loans from the FDIC as receiver for the failed banks . . .

3.19    The Acquisition Business Plan also contained a chart depicting the projected organic loan originations that management believed the Bank would most likely achieve, totaling $603 million in 2010, $2.046 billion in 2011, and $2.625 billion in 2012.

3.20    The Acquisition Business Plan stated that the Bank would maintain not less than a 10% Tier 1 leverage ratio throughout the entire period covered by the plan and the financial model, which the FDIC's Statement of Policy on Qualifications for Failed Bank Acquisitions (the "FDIC's Policy Statement") required in order for Opus to be eligible to make a bid to acquire a failed bank from the FDIC, a key component of the growth strategy during the first 18 months of the Plan. The FDIC's Policy Statement also required that the Key Investors hold their stock in the Bank for three years after a failed bank acquisition by the Bank.

COMPLAINT
PAGE 9

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

3.21    A bank's Tier 1 leverage ratio is the percentage of its Tier 1 capital to its average total assets less its ineligible intangible assets, such as goodwill.  Tier 1 capital is the sum of the bank's core capital components (principally common shareholders' equity, but also other qualifying forms of core capital for regulatory purposes) minus ineligible intangibles, such as goodwill.

3.22    By the end of the summer of 2010, the placement agents believed that sufficient investor interest and commitments were in place to complete a $460 million offering and to proceed with the Bay Cities Transaction.

3.23    By September 30, 2010, the DFI had approved and the FDIC had granted its non-objection to Gordon's application for the Bay Cities Transaction, including the Acquisition Business Plan, and the DFI issued stock permits to allow the sale by Bay Cities of stock and other securities pursuant to the 2010 Offering.  The FDIC's non-objection letter imposed a condition that the Bank submit to the FDIC and the DFI an updated business plan within 60 days after consummation of the Bay Cities Transaction and, thereafter, within 60 days after the consummation of each subsequent bank acquisition.

3.24    Gordon's acquisition of Bay Cities closed on September 30, 2010.  On that date, as contemplated in the Acquisition Business Plan and 2010 PPM, Bay Cities converted from a national bank to a California chartered commercial bank, changed its name to Opus Bank, and sold shares of common stock (at a price of $20 per share) and shares of convertible preferred stock (at a price of $1,000 per share) to the Key Investors, Gordon and the remaining investors for total proceeds before expenses of $460 million.  As further contemplated in the Acquisition Business Plan and 2010 PPM, and to satisfy the contractual requirements imposed by the Key Investors, nine individuals (including Gordon who was elected as the Chairman of the Board, President, and CEO) were appointed to replace Bay Cities' existing Board of Directors and the following four key members of the

COMPLAINT
PAGE 10

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Bank's senior management team (collectively, the "Key Executive Officers") were appointed to the following respective positions that were described in more detail in the 2010 PPM:

| | |
|---|---|
| Richard Sanchez ("Sanchez") | Executive Vice President ("EVP"), Chief Risk Officer ("CRO"), Chief Administrative Officer, and Secretary; Sanchez was also appointed to the Board of Directors |
| Carey Brennan | EVP and Managing Director of Corporate Development |
| Donald Royer | EVP and General Counsel |
| Thea Stuedli ("Stuedli") | EVP and Chief Financial Officer ("CFO") |

The three Key Investors purchased in combination approximately 65 percent of the shares of common stock (calculated on an as converted fully diluted basis) sold by the Bank in the 2010 Offering.  Each of the Key Investors received warrants to purchase additional shares of stock (either common at a price of $20 per share or preferred at a price of $1,000 per share) and was granted the right to designate one person to serve as a director of the Bank. The names of and biographical information for each of the three Key Investor designated directors were disclosed in the 2010 PPM:  they began serving as directors concurrent with closing of the Bay Cities Transaction.  All of the purchasers of stock in the 2010 Offering, including the three Key Investors, were granted the right to purchase their respective pro rata percentage share of additional Bank stock sold in future offerings.

COMPLAINT
PAGE 11

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

**Employment Agreements for Gordon, Brennan,
and Opus Bank's Other Key Executive Officers**

3.26    The Gordon/CCB Employment Agreement was used as the template for drafting the Bank's employment agreement with Gordon with modifications to correct the ambiguities Brennan identified during his review of the Agreement on behalf of WAMU in 2006.

3.27    The Bay Cities Employment Agreement for Gordon[1] was prepared by attorneys with Patton Boggs, the law firm retained by Gordon for the Bay Cities Transaction and the drafters of the Gordon/CCB Employment Agreement.  The partner at Patton Boggs responsible for the matter was Norman Antin ("Antin"), who had served as principal outside corporate counsel for the Bay Cities Transaction and for other companies Mr. Gordon led, including CCB and Fremont.  During the 2010 Offering, the proposed employment agreement for Gordon was provided to and discussed with the Key Investors and their attorneys, who negotiated with Gordon to make changes to a few of its provisions.  After Gordon and the Key Investors agreed to the terms of Gordon's employment agreement, Antin and his colleagues at Patton Boggs prepared a form of employment agreement for the Key Executive Officers, including Brennan.  The material terms in the final forms of employment agreements for Gordon and the Key Executive Officers were described in the 2010 PPM and the stock purchase agreements involving Bay Cities.  Each of the Key Investors required that Gordon and the Key Executive Officers sign these employment agreements as a condition to closing the 2010 Offering.

3.28    Because Bay Cities was in a "troubled condition", the FDIC had to approve the hiring of the proposed new executive management team, including Gordon and the Key Executive Officers, and the terms of their employment.  In order to obtain the non-objection

---

[1]  **Exhibit 1**

COMPLAINT
PAGE 12

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

of the FDIC to the terms of the proposed employment agreements for Gordon and the Key Executive Officers, it became necessary to adopt two forms of employment agreements. "Form A" was to be signed in connection with the closing of the Bay Cities Transaction. It limited the amount of severance to be paid the employee to one year's salary, the limitation imposed by the FDIC's regulations applicable to banks in a "troubled condition", despite the fact that the Key Investors had approved a severance payment equal to three times the employee's annual compensation (principally salary and bonus). The other form ("Form B") was to be signed and go into effect immediately upon termination of the Bank's "troubled condition" status, which was expected to occur promptly following completion of the Bay Cities Transaction, and provided for a severance payment equal to three times the employee's annual compensation (principally salary and bonus), the amount approved by the Key Investors. The Form B agreement also included a "golden parachute" provision in Section 13 that was omitted from the Form A agreement.

3.29    In light of this history, neither Brennan nor – to his knowledge and belief – any of the other Key Executive Officers was able to, or allowed to, or did, negotiate changes to any of the terms of the employment agreements. All of the terms of the employment agreements for Gordon and the Key Executive Officers were identical in all material respects except for the salaries, job titles, positions and, in the case of Gordon's employment agreement, the specific changes the Key Investors had negotiated with him, which were not applicable to the employment agreements for the Key Executive Officers. Gordon and Brennan had agreed that Brennan would not be required to relocate from his home in Kirkland, Washington, to Irvine, California, the planned location for the Bank's new administrative headquarters. Accordingly, the form of the employment agreements for Brennan would reflect his residency in Washington and would provide reimbursement for reasonable expenses for travel and housing accommodations while he was away from home

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA 98104
(206) 624-1177
FAX (206) 624-1178

on the Bank's business.

3.30    Brennan's belief about the take-it or leave-it nature of his employment agreement was confirmed when Royer, the Bank's proposed general counsel, copied Brennan and Gordon on an email he sent on August 25, 2010 distributing the form of the employment agreement to other individuals who would become executive vice presidents ("EVPs") of the Bank after consummation of the Bay Cities Transaction.[2]  Royer sent a separate, identical, email on the same date to individuals who would become senior vice presidents ("SVPs) of the Bank after consummation of the Bay Cities Transaction.[3]

3.31    By August 2010, the FDIC had verbally given its non-objection to the hiring of Gordon and the Key Executive Officers and the terms of their respective employment by the Bank, including the Form A and Form B employment agreements.  This approval was confirmed in writing on September 30, 2010.

3.32    On September 30, 2010 the Bank's Board of Directors approved both the Form A and the Form B employment agreements for Gordon and the Key Executive Officers.

3.33    Brennan signed his Form A employment agreement[4] in his residence in Kirkland, King County, Washington in late September, 2010.  At approximately the same time Messrs. Royer and Sanchez and Ms. Stuedli signed their Form A employment agreements.[5]  The material provisions in the Form A Agreement for Brennan included the following:

§1.    Term.  The term was three years, with an annual option by the Board to renew or extend it for another year.

---

[2]  **Exhibit 2 (Sealed)**
[3]  **Exhibit 3 (Sealed)**
[4]  **Exhibit 4**
[5]  **Exhibit 5**

COMPLAINT
PAGE 14

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

§2.    Duties and Authority.    Brennan was named as an Executive Vice President and Director for Strategy and Corporate Development who "shall perform such customary, appropriate and reasonable executive duties as are normally assigned to a person with such position at other similarly situated banks, including such duties as are delegated to him from time to time by the Chief Executive Officer.  [Brennan] shall report directly to the Chief Executive Officer [Gordon]."

§4.    Compensation.    Brennan's base salary would be $425,000 per year. He would also be eligible for bonuses and stock options and/or restricted stock awards as determined by the Board to be appropriate and to participate in any company retirement, pension, profit-sharing, and/or deferred compensation plans.

§8.    Remedy.    ". . . in addition to any other rights or remedies which may be available to it, [the Bank, but not Brennan] shall be entitled to injunctive and other equitable relief to prevent or remedy a breach of this Agreement by Employee."

§9.    Termination Without Cause.    Section 9(c) allowed termination of Brennan's employment without cause, provided that:

> Upon the occurrence of any event giving rise to Good Reason described in clause (ii) of Section 9(b), Employee shall have the right to terminate with Good Reason his employment under this Agreement ("Termination with Good Reason") by delivering written notice to the Bank within ninety (90) days following the occurrence of such event, describing in reasonable detail each event giving rise to Good Reason.   Such Termination with Good Reason shall be effective only if (i) each event giving rise to Good Reason is not cured within thirty (30) days after the Bank's receipt of such notice and (ii) the Date of Termination is no later than two years following the initial occurrence of an event described in clause (ii) of Section 9(b) giving rise to the Termination with Good Reason.  A Termination with Good Reason shall be treated as an involuntary termination.

COMPLAINT
PAGE 15

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Section 9(b)(ii) identified six events constituting "Good Reason" including "(B) material change in Employee's function, duties, or responsibilities with the Bank, which change would cause Employee's position to become one of substantially lesser responsibility or scope from the position and attributes thereof described in Section 2 above, unless consented to by Employee; . . . or (F) material breach of this Agreement by the Bank."

Upon Brennan's termination for Good Reason or upon termination of Brennan's employment by the Bank for any reason other than for "Cause" (as defined in Section 10(a)), Brennan was entitled to (i) a "Severance Payment" equal to 12 months annual salary (Section 9(d)), (ii) automatic vesting of all restricted shares of stock and options awarded to him (Section 9(e)), and (iii) life, medical, dental and disability coverage for himself and his dependents for 12 months (Section 9(f)).

§16.    Dispute Resolution Procedures.

Except with respect to any claim for equitable relief (the pursuit of which shall not be subject to the provisions of this Section 16), any controversy or claim arising out of this Agreement or the Employee's employment with the Bank or the termination thereof, including, but not limited to, any claim of discrimination under state or federal law, shall be settled by binding arbitration in accordance with the Rules of the American Arbitration Association; and judgment upon the award rendered in such arbitration shall be final and may be entered in any court having jurisdiction thereof. Notice of the demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. In no event shall the demand for arbitration be made after the date when the institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations. This agreement to arbitrate shall be specifically enforceable under the prevailing arbitration law. Any party desiring to initiate arbitration procedures hereunder shall serve written notice on the other party. The

COMPLAINT
PAGE 16

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

parties agree that an arbitrator shall be selected pursuant to these provisions within thirty (30) days of the service of the notice of arbitration.  In the event of any arbitration pursuant to these provisions, the parties shall retain the rights of all discovery provided pursuant to the California Code of Civil Procedure and the Rules thereunder.  Any arbitration initiated pursuant to these provisions shall be on an expedited basis and the dispute shall be heard within one hundred twenty (120) days following the serving of the notice of arbitration and a written decision shall be rendered within sixty (60) days thereafter.  All rights, causes of action, remedies and defenses available under California law and equity are available to the parties hereto and shall be applicable as though in a court of law.  The parties shall share equally all costs of any such arbitration.

§18.   <u>Miscellaneous.</u>  Section 18(a) provides that "[t]his Agreement shall be construed in accordance with the laws of the State of California."  Section 18(g) states that "[t]he provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof."

3.34   The provisions concerning Termination Without Cause, Dispute Resolution and Sections 18(a) and (g) in the Form A and Form B employment agreements for Gordon, the Key Executive Officers, the other EVPs and the SVPs, were identical and were taken verbatim from the Gordon/CCB Employment Agreement of 2001.

3.35   On September 30, 2010, the Board also adopted a Long-Term Incentive Plan and on that day Brennan was presented with, and in his Kirkland, Washington home he signed, a Long-Term Incentive Plan Stock Option Agreement and a Restricted Stock Award Agreement.  Pursuant to the Restricted Stock Award Agreement, Brennan was granted 133,337 shares of the Bank's common stock, half of which vested immediately upon the grant date and the remaining half vested according to a schedule set forth in the agreement.  Pursuant to the Long-Term Incentive Plan Stock Option Agreement, Brennan was granted

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

an option to acquire 124,374 shares of the Bank's common stock at the exercise price of $20 per share, half of which would vest on September 30, 2012 and the remaining half would vest on September 30, 2013.  Both of these agreements provided for accelerated vesting if Brennan terminated his employment for Good Reason or if the Bank terminated Brennan for any reason other than for Cause, as such terms were defined in Brennan's employment agreement.  The equity grants made to Brennan were consistent with the promises Gordon made to Brennan to induce him to join the Opus senior management team.

3.36   On December 15, 2010, at Gordon's request and with his approval, Opus Bank issued a press release announcing the formation of the Bank's seven-member executive committee, comprised of Gordon, the four Key Executive officers, and the Bank's new Chief Credit Officer and Chief Operating Officer.  The press release described Brennan's function, duties and responsibilities as:

> . . . responsible for the formulation of Opus Bank's long-range strategic and financial objectives and execution of the bank's growth strategy, particularly through acquisitions. His acquisition-related duties include working with other members of Opus Bank's executive team to (i) source and screen potential acquisition targets, (ii) conduct business and financial due diligence, (iii) determine appropriate valuation and deal structure, negotiate terms, (iv) drive activities to closure, and (v) effectuate an efficient and timely post-close integration process.

3.37   This description of Brennan's functions, duties and responsibilities was consistent with Gordon's promises to Brennan concerning his role as Executive Vice President and Managing Director of Corporate Development for the Bank, which Brennan relied upon when deciding to leave Chase, to work side-by-side with Gordon to negotiate and complete the Bay Cities Transaction and the 2010 Offering, and ultimately to accept employment with the Bank.

COMPLAINT
PAGE 18

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

3.38     As Brennan was to be "responsible for the formulation of Opus Bank's long-range strategic and financial objectives and execution of the bank's growth strategy", and Gordon's vision for Opus Bank included significant growth in assets through acquisitions of other banks and significant increases in capital through additional private offerings – the very activities for which Brennan had been principally responsible in connection with the Bay Cities Transaction – Gordon led Brennan to believe that he would be playing an influential role in the Bank's leadership, development and growth.  Gordon affirmed and reinforced Brennan's beliefs by appointing him to the Bank's seven-member executive committee and inviting him to regularly attend the meetings of the Bank's Board of Directors, which Brennan did from the beginning.

### Opus Bank:  October 2010 – December 2011

3.39     During the 10-month period that Gordon and Brennan worked to complete the 2010 Offering and the Bay Cities Transaction, Gordon was also busy assembling the persons who would join him and the Key Executive Officers as the new management team for Opus Bank, many of whom had worked for Gordon at CCB and/or Fremont.  By the closing of the Bay Cities Transaction, this group numbered 37 persons, composed of Gordon, the four Key Executive Officers, five additional EVPs, 17 SVPs, and ten additional officers and employees below the level of SVP.  Their combined annual salaries would be approximately $9 million, increasing by almost 75 percent the number of full-time-equivalent employees ("FTE") working for Bay Cities immediately prior to the closing and tripling its annualized expense for salaries and employee benefits.  Janqueline Schrag ("Schrag") was one of the SVPs in this group.   Upon Brennan's referral and recommendation, Gordon hired Schrag to report to Brennan as Deputy Director of Corporate Development.

3.40     Concurrent with the closing of the Bay Cities Transaction, the Bank

COMPLAINT
PAGE 19

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

subleased office space for a new administrative headquarters in a building in Irvine, California.  From the new Irvine office, under Gordon's direction and leadership, the Bank's new management team immediately began to identify locations for potential new banking offices and potential targets for additional bank acquisitions; add personnel; review, revise and update Bay Cities' policies, procedures, processes and methodologies, which the bank regulators had previously identified as being materially deficient; upgrade or replace altogether the Bank's operating systems, technology platforms and computer systems and peripherals; and to otherwise prepare the Bank for the multiple acquisitions and aggressive organic loan and deposit growth projected in the Acquisition Business Plan.

3.41    Brennan and Gordon were proud to have successfully completed the Bay Cities Transaction, which Gordon described in an email to Brennan on the day of closing as "the most difficult transaction I've ever worked on."  Brennan was excited to be part of the new management team.  To facilitate his frequent trips from his home in Kirkland, Washington to Orange County, Brennan and his wife leased and, at their own expense, furnished a condominium in close proximity to the Irvine office and Brennan leased a vehicle to keep in California.  He was enthusiastic to undertake with Gordon and the rest of the new management team the difficult work that lay ahead to bring Opus Bank from Gordon's vision to reality, which had already begun to grow.  Gordon began to say that the real opportunity for the Bank was far larger than the $16 billion of total assets contemplated in the Acquisition Business Plan:  he talked about growing Opus to assets of $50 billion or even $100 billion.  He often said that it was time to return banking to the days of the "House of Morgan," when bankers respected their "clients" – not customers – and "clients" respected their bankers, and when banks had "banking offices", not branches or – worse yet– stores and store fronts.  Gordon insisted that Opus employees use this "House of Morgan" terminology and was quick to correct them when they didn't.

COMPLAINT
PAGE 20

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

1
2
3
4
5
6
7
8
9

3.42    For the first several months of his employment with Opus Bank, Brennan performed those functions, duties and responsibilities described in the Bank's December 2010 press release.   During this period, Brennan and Gordon regularly discussed and Brennan analyzed, evaluated and screened numerous potential targets for additional bank acquisitions, including several opportunities to bid to acquire failed banks from the FDIC. Unfortunately, the FDIC failed bank opportunities in the Western region during the first six months of Opus Bank's existence were too small and too geographically dispersed to warrant taking on the expense and burden of administering a failed bank and triggering the constraints of the FDIC's Policy Statement.

10
11
12
13
14
15
16
17
18
19
20
21
22

3.43    During their first months at Opus Brennan, with Schrag's assistance, began hiring permanent and temporary staff for the Corporate Development department to support the expected number of additional bank acquisitions.   They also began developing and documenting processes, procedures, methods and guidelines for acquisitions including due diligence, market research and analysis, management and Board level transaction approvals, and acquisition closings and integrations.  During October and November 2010 Brennan worked with Stuedli, the Bank's CFO, to prepare an updated business plan (the "First Updated Business Plan") to satisfy the condition imposed by the FDIC in its non-objection letter for the Bay Cities Transaction, which was due to be submitted to the FDIC and the DFI by November 29, 2010.  In December they became immersed in the analysis of Cascade Financial Corporation ("Cascade Financial"), an institution headquartered in Everett, Washington, that Gordon had learned was a potential acquisition target through his contacts at Sandler O'Neill.

23
24
25
26

3.44    In November 2010, Gordon and then the Board of Directors of the Bank approved the First Updated Business Plan covering the three-year period October 1, 2010 through September 30, 2013, revising the Acquisition Business Plan.  Like the Acquisition

COMPLAINT
PAGE 21

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

1    Business Plan, the First Updated Business Plan stated that financial projections set forth in

2    the plan were based on a five-year financial model that "***depicts events, outcomes and***

3    ***results we believe we will most likely achieve***" (emphasis added), which, except for

4    relatively immaterial changes, included the same key assumptions described in the

5    Acquisition Business Plan concerning acquisitions of failed banks from the FDIC, future

6    capital raises, organic loan growth, and maintenance of a 10% Tier 1 leverage ratio.

7    Brennan submitted the First Updated Business Plan to the FDIC and the DFI on November

8    21, 2010.

9         3.45    After the closing of the Bay Cities Transaction, the FDIC conducted an on

10   site, limited scope examination to confirm that the Bay Cities Transaction and the 2010

11   Offering had been completed consistent with the representations made to the FDIC in

12   support of its non-objection letter.  Shortly thereafter, the Bank's "troubled condition"

13   status was removed and, on December 3, 2010, Brennan signed the previously approved

14   Form B employment agreement[6], which was again identical to those signed by the other

15   Key Executive Officers except for the provisions concerning his residency in Kirkland,

16   Washington and reimbursement of his reasonable expenses for travel and housing

17   accommodations while away from his home on the Bank's business.  This employment

18   agreement remained in effect until Brennan's employment was terminated.

19        3.46    In its Consolidated Reports of Condition and Income ("Call Report") for the

20   quarter ended December 31, 2010, Opus reported that the ranks of its personnel had grown

21   to 125 FTE – a 250% increase in personnel in one quarter – and its salary and benefits

22   expense for the quarter was $22.4 million, driving a $31.8 million net loss for the quarter,

23   as Gordon ramped up personnel and operating expenses to support the Bank's anticipated

24   growth and the Bank recognized the expense associated with the equity granted to Gordon

25

26   [6] **Exhibit 6**

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

and the other senior officers at the closing of the Bay Cities Transaction.  By March 31, 2011, the Bank's personnel ranks had grown by another 34 FTE to 159, with annualized salary and benefits expenses totaling over $31 million.

3.47    After months of intensive due diligence, analysis, deliberation and contract negotiation led primarily by Brennan, Opus announced on March 4, 2010 that it had entered into a definitive merger agreement to acquire Cascade Financial, a publicly-held Washington corporation and parent of Cascade Bank, a troubled bank with a very attractive deposit franchise consisting of 22 branches in King, Snohomish, and Skagit Counties in Washington State, for total consideration of $21.75 million (the "Cascade Transaction"). The Bank's Board of Directors unanimously approved the Cascade Transaction, although Gordon was the only director who knew that Opus Bank's then Chief Credit Officer told him that she disagreed with management's analysis of and conclusions regarding credit losses embedded in Cascade's loan portfolios.

3.48    Opus Bank's acquisition of Cascade was consummated on June 30, 2011. This acquisition was transformational for Opus, particularly its balance sheet, in several important respects.  By the time Opus merged with Cascade, Gordon had grown its staff to over 200 FTE, more than the number of FTE at Cascade, a bank with twice the assets, three times the number of branches, and five times the amount in loan balances.  In nine months, the Bank's salaries and employee benefits expense had ballooned to over $30 million on an annualized basis, about 230% of that category of expense at Cascade.  Opus had announced the opening of seven new banking offices in Southern California.  Organic loan and deposit growth were badly lagging projections.  Opus needed to dramatically increase assets and deposits to begin to rationalize the operating platform Gordon was building, which Gordon hoped Cascade would help to achieve.  Cascade was also the Bank's initial expansion in the Western region outside Southern California, giving Opus a large footprint in the Pacific

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Northwest and the attractive Seattle metropolitan market.

3.49   But these benefits came at a steep cost to Opus despite the relatively small purchase price paid to Cascade's shareholders.  Cascade had substantial unreserved losses embedded in its balance sheet, particularly in its loan portfolio, that Opus was required to recognize under purchase accounting principles resulting in the addition of approximately $167 million of goodwill and $12 million of other intangible assets to the Bank's balance sheet and corresponding reductions in the Bank's tangible equity and Tier 1 capital.  As a consequence, the Bank's important Tier 1 leverage ratio would decline from 55% at the end of March 2011 to slightly under 12% at the end of September 2011.  While the acquisition also resulted in sizeable, but fully reserved, deferred tax assets and accretable loan discounts that were projected to add significantly to income in future periods, the Bank's reduced Tier 1 leverage ratio would become a constraint on future acquisitions and its reduced tangible equity would prove to be a concern to potential new investors with respect to the Bank's share price.

3.50   The acquisition of Cascade increased the Bank's portfolio of purchased impaired loans from slightly over $4 million to nearly $900 million, with a carrying value of $742.5 million.

3.51   Also in June 2011, Opus entered into a definitive agreement to acquire the parent company of Fullerton Community Bank, a savings bank with $681 million in total assets, $529 million in total loans, $511 million in total deposits, and eight banking offices in northern Orange County, California, for $50 million in cash (the "Fullerton Transaction").

3.52   The Bank's news release announcing the completion of the Cascade Transaction stated that, at year end 2011, on a *pro forma* basis after closing the Fullerton Transaction, the Bank expected to have nearly $3 billion in total assets, a projection that it

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

would miss by nearly 25%. Its actual total assets at the end of 2011 were only $2.4 billion, primarily because its organic loan growth projections continued to be far too ambitious.

3.53   The Bank's Board of Directors had unanimously approved the Fullerton Transaction without a financing contingency. Nevertheless, the significant decline in the Bank's Tier 1 capital resulting from the Cascade Transaction meant that the Bank would risk dropping below the FDIC's required 10% minimum Tier 1 leverage ratio on a *pro forma* basis after acquiring Fullerton if it did not raise additional capital and/or curtail its already lagging organic loan growth or otherwise reduce its assets.

3.54   In the summer of 2011, Gordon invited representatives of Sandler O'Neill and Credit Suisse to make a presentation to the Bank's Board of Directors concerning current conditions in the capital markets and prospects for the Bank raising additional capital, perhaps including the prospects for a potential IPO of the Bank's common stock. Brennan attended the meeting during which this presentation was made, having received and reviewed the written presentation materials prepared by Sandler O'Neill and Credit Suisse prior to the meeting. This presentation indicated there was the potential for completing an IPO in 2012 at a company valuation equal to 10.5 times its projected 2013 tax adjusted net income, preceded by a private placement in 2011 at a lesser valuation, which these financial advisers recommended should include meaningful participation by a substantial number of the Bank's existing shareholders, including the Key Investors. They cautioned that these valuations as a multiple of the Bank's tangible book value, which had been greatly reduced by the goodwill incurred in the Cascade Transaction and would be further reduced by the additional goodwill expected to result from the acquisition of Fullerton, could be problematic for potential investors. However, the representatives from Sandler O'Neill and Credit Suisse said they thought investors would look favorably upon *pro forma* adjustments to tangible book value to reflect the future release of Bank's fully

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

reserved deferred tax assets and the accretable portion of purchased loan discounts.

3.55    Based on this information, Bank management, the Board, and the representatives from Sandler O'Neill and Credit Suisse concluded that it would be reasonable to proceed with a new $185 million private placement of the Bank's common stock at a price not less than $20 per share (the "2011 Offering").  The Bank retained Sandler O'Neill and Credit Suisse to act as placement agents for the 2011 Offering and hired Patton Boggs as outside legal counsel for the 2011 Offering and the Fullerton Transaction.

3.56    In order to comply with the condition imposed by the FDIC to submit an updated business plan within 60 days after each bank acquisition, Brennan and Stuedli and their staffs prepared an updated business plan for the three-year period July 1, 2011 through June 30, 2014 reflecting the balance sheet impact of the Cascade acquisition (the "Second Updated Business Plan"), which Gordon and then the Bank's Board of Directors approved. Gordon submitted the Second Updated Business Plan to the FDIC and the DFI under cover of a letter dated August 29, 2011.

3.57    As had been the case with the 2010 PPM, Brennan oversaw the drafting of a new private placement memorandum for the 2011 Offering (the "2011 PPM").  The 2011 PPM, the Second Updated Business Plan, and other records and information concerning the Bank were made available, including through an electronic data room, for review by potential investors who expressed an interest in purchasing stock in the 2011 Offering.

3.58    On September 27, 2011 Gordon informed Brennan that the Bank's Board of Directors had renewed and extended his employment agreement by an additional year.

3.59    After obtaining the requisite stock permits from the DFI, on or about October 25, 2011, Opus sold shares of common stock (at a price of $20 per share) and convertible preferred stock (at a price of $1,000 per share), raising $100 million before

COMPLAINT
PAGE 26

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

expenses.   All of these shares were sold to the Bank's existing shareholders, as the placement agents' efforts to obtain commitments from new investors while actively underway had not yet resulted in commitments.   The placement agents continued to seek new investors to purchase the $85 million remaining from the 2011 Offering.

3.60    On or about October 26, 2011, Opus granted Brennan an option to acquire 23,925 shares of Bank common stock and 10,254 shares of Bank restricted common stock, both pursuant to the Bank's 2010 Long-Term Incentive Plan and consistent with disclosures in the 2011 PPM.   As with the initial grants of equity to Brennan, the award agreements provided that vesting would accelerate if Brennan was terminated by the Bank for any reason other than Cause or Brennan terminated his employment for Good Reason, as defined in Brennan's employment agreement.

3.61    On October 31, 2011, Opus completed the Fullerton Transaction, adding seven banking offices in northern Orange County, California to the five former Bay Cities' banking offices in the South Bay area of Los Angeles, the three new banking offices Opus had opened in Los Angeles County, and the 22 former Cascade banking offices in the Puget Sound area of Washington state.   By this time, Opus had announced plans to open nine additional banking offices.   As of October 31, 2011, Opus Bank had approximately $2.6 billion in total assets, $1.5 billion in net total loans, $254 million in goodwill and other intangible assets, $1.9 billion in total deposits, $496 million of total equity, $242 million of tangible equity and a Tier 1 leverage ratio of 12.9%.

3.62    In order to again comply with the condition imposed by the FDIC to submit an updated business plan within 60 days after each bank acquisition, Brennan and Stuedli and their staffs prepared an updated business plan for the three-year period October 1, 2011 through September 30, 2014, reflecting the balance sheet impact of the Fullerton acquisition, which was reviewed and approved by Gordon and then by the Bank's Board of

COMPLAINT
PAGE 27

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Directors (the "Third Updated Business Plan").  Stuedli submitted the Third Updated Business Plan to the FDIC and the DFI on December 22, 2011.  She also sent a copy of it to Sandler O'Neill with instructions to deposit it in the electronic data room, making it available for review by potential investors who expressed an interest in purchasing a portion of the remaining $85 million in Opus stock from the 2011 Offering.

3.63    After four consecutive quarters of losses totaling $57 million, in the fourth quarter of 2011 Opus reported a small profit of $2.3 million, as it began to realize the benefits and synergies of the acquisitions of Cascade and Fullerton.  Despite the asset growth from these acquisitions, organic loan growth continued to lag Gordon's aggressive expectations and projections, while the Bank's operating expenses continued their steep ascent, as expenses for salaries and benefits (by the end of 2011 Opus had 550 FTE) and total noninterest expense reached $41.7 million and $69.1 million, respectively, for 2011.

The Third Updated Opus Business Plan

3.64    Like each of its predecessor business plans, the Third Updated Business Plan contained a lengthy (35 page) narrative which described, among other things the Bank's history, mission statement, and business; its growth strategy (through acquisitions of additional banks and organic growth); and its marketing and management plans.  The models used to project the results depicted in the Acquisition Business Plan and the First Updated Business Plan assumed there would be acquisitions of only failed banks with assistance from the FDIC which would not add goodwill to the Bank's balance sheet.  In contrast, the model used to project the results depicted in the Third Updated Business Plan assumed acquisitions of only "open" banks without assistance from the FDIC, adding substantial goodwill to the balance sheet of the Bank.  This change was first made in the Second Updated Business Plan to reflect management's view that the opportunities for acquiring attractive failed banks had greatly diminished and that future acquisitions were

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

far more likely to resemble those of Cascade and Fullerton.  In addition, commencing with the Second Updated Business Plan, management began the practice of creating an "organic only" financial model, predicting events, outcomes and results assuming the Bank did not acquire any additional banks and grew only organically through expansion of banking offices and loan and deposit growth.  The organic only financial models were reviewed with the Board of Directors prior to their approval of the updated plans.

3.65   The Third Updated Business Plan, like each of its predecessor business plans, discussed at length and in detail the Bank's financial projections for five years into the future and the financial model from which those projections were derived, stating that "***The financial model predicts events, outcomes and results we reasonably believe we will achieve based on current information and our expectations for future performance and market conditions***."   The plan proceeded to describe the assumptions and variables in the financial model that management believed "***most significantly impact projected growth, financial results and performance of the Bank***" (emphasis added):  they included future acquisitions, the amount and timing of the release of reserves related to the Bank's deferred tax assets, and future capital raises.

3.66   With respect to future bank acquisitions, the Third Business Plan said, in relevant part:

> The Bank will complete acquisitions of additional banks in unassisted transactions.   It is difficult to model future acquisitions because of the inherent uncertainty related to timing, structure, balance sheet size and composition, and terms.   The model assumes that the Bank will complete acquisitions in the second and third quarters of 2012 and the first and third quarters of 2013 (each an "*Acquisition Period*").   As a result of these acquisitions, which may involve single or multiple banks and multiple transactions in each Acquisition Period, the Bank is projected to:   (a) Assume $750 million in deposits in the first Acquisition

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Period, to assume $675 billion [sic] in deposits in the second Acquisition Period, and to assume $1.35 billion in deposits in the third and fourth Acquisition Periods, reflected in the pro forma financial projections as "acquired deposits," (b) to acquire approximately $666 million in loans net of discounts in the first Acquisition Period and $675 million in the second Acquisition Period and to acquire approximately $1.35 billion in loans net of discounts in the third and fourth Acquisition Periods, reflected in the pro forma financial projections as "acquired loans," and (c) to acquire nearly $10 million in cash and securities in the first and second Acquisition Periods and to acquire nearly $20 million in cash and securities in the third and fourth Acquisition Periods.

3.67   With respect to future capital raises, the Third Business plan said, in relevant part:

The Bank will complete three subsequent capital raises, the first in the first calendar quarter of 2012, resulting in net projects of approximately $81 million ($85 million gross proceeds); the second capital raise in the second calendar quarter of 2012, resulting in net proceeds of approximately $105 million ($110 million gross proceeds); and the third capital raise in the third calendar quarter of 2012, resulting in net proceeds of approximately $257 million ($270 million gross proceeds).  We expect the first capital raise in 2012 will be completion of the remaining $85 million private placement currently underway.  We expect the second capital raise in 2012 will be another private placement of securities.  And we expect the third capital raise in 2012 will be an initial public offering of the Bank's common stock."

3.68   Like each of its predecessor business plans, the Third Updated Business Plan stated that the Bank would maintain a Tier 1 leverage ratio of at least 10% over the full five years of the financial model and included a chart depicting funded loans from organic growth by loan type over the full five years of the financial model, indicating total originations of $1.299 billion, $2.431 billion, $3.545 billion, $4.069 billion and $4.257 billion for the yearly periods ending on September 30 of 2012, 2013, 2014, 2015 and 2016, respectively, projections that had been developed first in the organic only financial model

COMPLAINT
PAGE 30

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

and were slightly less than the projections for organic loan growth depicted in the Second Updated Business Plan.

### January 25 through March 2, 2012

3.69    The Opus Board of Directors met on January 25, 2012 and listened to Stuedli describe the Bank's fourth quarter and year-end 2011 financial statements and results, including her explanation of the addition of $6.4 million in loans loss reserves during the fourth quarter.   The three directors designated by the Key Investors asked numerous questions about the credit analysis and loan loss projections made in connection with the acquisitions of Cascade and Fullerton and how the projections and assumptions made during due diligence compared to actual performance following the acquisitions. Stuedli and her Controller explained the accounting for purchased impaired loans that applied to virtually all of the Cascade and Fullerton loan portfolios.   These directors expressed concerns about the Bank's ability to generate the capital needed to support the acquisition strategy going forward and questioned the Bank's ability to generate acceptable returns if its high operating expenses were not reduced significantly, particularly if acquisitions were discontinued.

3.70    On February 1, 2012, a special telephonic meeting of only the non-management directors (Gordon and Sanchez were not present) was held.  The draft minutes of the meeting reflected, among other things, the following :

> There was discussion of the present capital raise initiative underway as approved by the Board, and what might be viewed today as an ambitious valuation multiple to tangible book value for the Bank, and the Board members acknowledged the possibility that additional capital raises may not succeed in the very near term.
>
> It was then noted that absent new capital, it might not be possible to make meaningful additional cash acquisitions.

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

> And that the current cost structure might only be appropriate for an institution of much greater size . . .
>
> The Board members discussed and there was debate as to whether certain Board members were advocating an immediate reduction in Opus Bank's cost structure. Such Board members expressed that it was not their position that an immediate cost reduction strategy should be pursued, but instead expressed that the Board should ask management to present to the Board a specific detailed analysis and plan that would provide a path to achieving acceptable shareholder returns if an organic-only growth scenario were to be pursued, (no further planned acquisitions), and that organic growth only [sic] plan would be available to be activated if and when circumstances dictate or if the Board were to decide to pursue that path, perhaps within the next one or two quarters . . . The Board Members in Executive Session agreed that it was prudent to have an alternative, fully developed plan, which does not presuppose access to capital.

3.71   The Board agreed to prepare a written summary of the meeting for "the benefit of management, and to include specific analytic requests to help frame the issues for discussion at the next special meeting of the Board, and to provide guidance for the analytic work product the Board members would like to have presented on these topics". These topics were to include "[p]reparation of an organic-growth only business plan, which assumes no additional capital raises during 2012 and no additional cash acquisitions . . . which would include various categories and specifics including the numbers of employees who might be terminated, with estimated expense and resulting cost saves, . . ."

3.72   In response to the Board's February 1 directive, Gordon immediately scheduled a special meeting of the full Board of Directors for March 1, 2012, and called members of senior management, including Brennan, to a meeting to discuss a proposed agenda. During one of these meetings Gordon said that the three directors designated by the Key Investors were driving this agenda, that they did not understand banks or banking, and that he would invite representatives of Sandler O'Neill to make a presentation at the

COMPLAINT
PAGE 32

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA 98104
(206) 624-1177
FAX (206) 624-1178

1    March 1 meeting to educate them.  He also requested that Brennan work with Stuedli, who

2    would be preparing the new organic only financial model and estimated cost reductions

3    requested by the Board.

4         3.73   Over the ensuing weeks, Brennan reviewed drafts of the new organic only

5    financial model and participated in meetings with Stuedli and others – including, on a

6    couple of occasions, Gordon – to discuss various iterations of the model.  An early version

7    of that model assumed there would be less loan growth volume then the assumptions used

8    in the Third Updated Business Plan.  Gordon rejected this model, insisting that the Board be

9    presented with a model using the Third Updated Business Plan's projected loan volumes.

10   He dismissed the opinions expressed by Stuedli and Brennan that the loan volumes

11   assumed for commercial business banking and residential lending in the Third Updated

12   Business Plan now appeared to be excessive and the business lines could not provide

13   support for them.   Nevertheless, Stuedli complied with Gordon's directive and began

14   drafting a model using the Third Updated Business Plan figures.  Brennan assisted Stuedli

15   by conducting market research and preparing analyses and charts depicting certain financial

16   metrics for Western region banks with end-of-period assets between $2 billion to $8 billion,

17   which Stuedli incorporated into her presentation to the Board.

18        3.74   During February, Brennan also prepared an analysis of the Bank's historical

19   loan "pipeline" reports, which projected organic loan closings over short periods of time,

20   comparing those projections to actual results.  Brennan's pipeline analysis showed that the

21   Bank consistently and materially overstated its short-term projections for loan closings;

22   even projections made mid-month for month end closings were regularly missed by wide

23   margins.  Moreover, actual results showed the Bank's loan growth for the last quarter of

24   2011 was over 25 per cent below its projection in the Third Updated Business Plan.

25   Brennan gave a copy of his analysis to Stuedli and discussed it with her.  He also gave a

26

COMPLAINT
PAGE 33

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

copy to Michael Allison, the Bank's then Chief Credit Officer.  Brennan also reviewed and commented on drafts of Sandler O'Neill's proposed presentation to the Board that was made on March 1, 2012.

3.75    Brennan attended the March 1 special meeting of the Board of Directors from his home via telephone.  Gordon conducted the meeting in three parts.  The Sandler O'Neill presentation occurred first, followed by Stuedli's presentation of the organic only growth model, after which Gordon convened an executive session of the Board.  The non-management directors saw Sandler O'Neill's written presentation materials for the first time at the meeting.  The non-management directors and Sandler O'Neill representatives saw Stuedli's written presentation materials for the first time at the meeting.

3.76    Jon Doyle and Murray Bodine, who were physically present, represented Sandler O'Neill at the meeting, and Bob Kleinert, another Sandler O'Neill partner, participated via telephone during their presentation.  The information presented by Sandler O'Neill showed that then prevailing market conditions, valuation multiples and share prices of publicly-traded banking institutions had deteriorated since the report they and Credit Suisse presented to the Bank's Board of Directors the previous summer.  The Sandler O'Neill representatives expressed doubt that an IPO could be completed at an acceptable valuation in 2012 without marked improvement in market conditions, which they did not expect.  Mr. Kleinert reported that they were continuing to try to sell the $85 million remaining from the 2011 Offering and, while a few investors continued to look at it, others who had initially expressed interest declined to invest because they concluded that the $20 per share price as a multiple of tangible book equity was too high in the current market.

3.77    The Sandler O'Neill representatives recommended that the Bank defer plans for an IPO in 2012 and instead concentrate on increasing the efficiency of the Bank's internal operations and improving its organic earnings.  During the discussion of the part of

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Sandler O'Neill's presentation related to the Bank's acquisition strategy, a director asked if Sandler O'Neill believed that the Bank's stock would be an acceptable form of consideration in a bank acquisition. Mr. Doyle replied that, while possible, he doubted it. He said he would assume that any bank target the Board might find attractive would also be of interest to other banks looking for acquisitions and any competitor that could offer consideration in the form of cash and/or publicly-traded stock would have a distinct advantage over Opus, given that the target would have to do a valuation of Opus, adding complexity to any Opus proposal.

3.78    Stuedli's presentation of the organic only financial model depicted several scenarios for the five-year period January 1, 2012 through December 31, 2016. All of the scenarios assumed organic loan growth volumes consistent with those used in the Third Updated Business Plan as directed by Gordon, with a one-quarter lag to reflect their different starting points (*i.e.*, October 1, 2011 in the Third Updated Business Plan and January 1, 2012 in the new model). The base case scenario assumed there would be no additional capital infusions, causing the Tier 1 leverage ratio to drop below the 10% minimum required by the regulators in 2012 and continuing to decrease each year thereafter to below 6% at its lowest point. Non-interest expense shown in the base case scenario assumed only the cost reductions already scheduled for 2012. Two additional scenarios ("Scenarios I and II") assumed that the Bank would raise additional capital as needed to maintain a minimum 10% Tier 1 leverage ratio. One of these two scenarios assumed non-interest expense would be reduced only by the cost reductions already scheduled for 2012; the other showed the additional non-interest expense reductions that management expected to make if the Bank made no additional acquisitions, including the elimination of the entire Corporate Development department accompanied by substantial severance costs. Variations of Scenarios I and II were presented which assumed that the Bank would

COMPLAINT
PAGE 35

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

maintain a 9% Tier 1 leverage ratio as Gordon had requested, because he had decided to ask the FDIC and the DFI to agree to lower the Bank's requirement to maintain a minimum Tier 1 leverage ratio from 10% to 9%.

3.79    During Stuedli's presentation at the March 1, 2012 Board meeting several of the non-management directors almost immediately began to question the Bank's ability to achieve the loan growth volumes in the model, which assumed the loan volume for 2012 would be three times the roughly $400 million actually achieved in 2011.  Gordon defended those assumptions despite knowing that Stuedli and Brennan believed they were unsupported, arguing that the size of the current loan pipeline, which he estimated to be around $100 million, justified the long-term loan growth projections.   Another non-management director observed that the projected 2012 net income in these scenarios was significantly less than the net income he recalled seeing in previous organic models presented to the Board in connection with the Second and Third Updated Business Plans.  A non-management director asked the Sandler O'Neill representatives if they believed they could successfully raise capital at a price of $20 per common share considering these revised earnings projections.  Mr. Bodine replied that he doubted it.  The 2011 Offering had been under way for over five months and not a single new investor had committed to purchase common stock at the minimum price of $20 per common share approved by the Board, or at any price for that matter.  All of the non-management directors who spoke said the Bank's non-interest expense, projected to be $109 million in 2012, was far too high for a bank its size, and cost reductions had to be made.

3.80    After lengthy discussion, Gordon said that it was clear that additional cost reductions would be needed.  He said that he had reviewed the projected severance costs of the staff reductions assumed in the scenarios presented in the model, which were based on the Bank's current severance policy – the very policy he approved for adoption by Cascade

COMPLAINT

PAGE 36

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

1    – and said that these severance costs were too high.  He said he intended to change the

2    policy to reduce the severance costs before announcing any staff reductions.  This was the

3    first time Brennan had heard this plan.  Gordon then asked to begin the Board's executive

4    session, at which time Brennan and the non-director participants left the meeting except for

5    Royer, who Gordon asked to remain.

6         3.81    By March 2011 Gordon had conceived of a plan to approach the Bank's

7    largest borrowers and depositors with a proposal to invest in the Bank's stock.  He had

8    instructed the presidents of the Bank's business lines to prepare lists of borrowers and

9    depositors who could be evaluated for potential investment.  This concerned Brennan

10   because he knew confidential information from the Bank, including the 2011 PPM and the

11   Third Updated Business Plan, would be made available to this group of targeted investors.

12   It was about this time that Brennan learned that Gordon had met with the CEO of a small,

13   six-branch bank headquartered in Riverside County, California, and discussed the

14   possibility of a merger between the banks, with the stockholders of the other bank taking

15   Opus stock as consideration in the merger.  Brennan had seen an email from the CEO of the

16   other bank asking to see forward-looking information concerning Opus, which Brennan

17   believed would include the Bank's business plans and projections for future earnings.

18        3.82    On Friday, March 2, 2012, Brennan participated in the regularly scheduled

19   meeting of the Bank's Executive Committee via telephone from his home.  That morning

20   Gordon had unilaterally lowered the offering rates on the Bank's loan and deposit products

21   and held meetings with the Bank's Treasurer and the heads of the business lines to direct

22   them to implement the changes.  During the Executive Committee meeting, Stuedli and

23   Sanchez expressed frustration and dissatisfaction with Gordon's unilateral actions that

24   morning, saying that it was bad governance and could cause regulatory concerns.  Gordon

25   angrily replied that he was done with committees and the delays and bureaucracy associated

26

COMPLAINT
PAGE 37

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

with them, that although he understood the need for good governance the changes he made had to be implemented and directed Sanchez and Stuedli to do what was necessary to make his actions consistent with good governance and Bank policy.  He then reported that the Board supported the idea of seeking regulatory approval to reduce the Bank's minimum Tier 1 leverage ratio requirement from 10% to 9% and also supported making additional cost reductions.  He said that senior management should start immediately to identify additional sources of cost reductions.  Gordon did not mention reducing the loan volumes assumed in the model nor did anyone else.

### Brennan's Concerns Regarding the Bank's Securities Disclosures

3.83    As noted earlier, after he read the draft minutes of the special meeting of the non-management directors held on February 1, 2012 Brennan had begun to consider the disclosure implications of the Board's potential reconsideration of the Bank's strategy. Brennan was intimately familiar with the statements in the Third Updated Business Plan concerning management's and the Board's beliefs about future acquisitions and capital infusions, two of the assumptions in the financial model that the Third Updated Business Plan said would most significantly impact projected growth, financial results and performance of the Bank.  He had drafted those statements and remembered the words used – "***The financial model predicts events, outcomes and results we reasonably believe we will achieve based on current information and our expectations for future performance and market conditions***."  The draft minutes of the February 1 Board meeting reflected reasonable doubts among the non-management directors about the Bank's ability to successfully raise capital and to complete meaningful cash acquisitions, at least in 2012, a year during which the Third Updated Business Plan and financial model assumed the Bank would complete three capital raises totaling $465 million in gross proceeds and complete two major acquisitions.  The draft minutes also reflected a view that the non-management

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

directors, or at least some of them, wanted to be ready to pursue an organic only (i.e., non-acquisition) growth strategy "within the next one or two quarters."   None of this information had been disclosed to potential investors, an omission which Brennan reasonably believed rendered the aforementioned statements materially misleading.   The information presented and the exchange between the Bank's management and its directors at the March 1 special board meeting heightened Brennan's concerns about the Bank's disclosures.   The Bank's outside financial advisers, experts in the banking industry who Gordon invited to the meeting to educate the non-management directors about **current** market conditions, shared those directors' doubts about the Bank's capital raising and acquisition prospects as reflected in the minutes Brennan had read, and provided supporting market data and analysis for their professional opinions.

3.84   As an attorney, Brennan understood that Federal and state securities laws and regulations, including Rule 10b-5 and its counterpart in the California Corporations Code,[7] make it unlawful to offer or sell any security by means of materially false or misleading statements or omissions of material facts.   And, while Brennan knew that forward-looking statements, including financial projections, are generally not actionable under these laws and rules when accompanied by appropriate cautionary statements, he also

---

[7]   "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or the mails, or of any facility of a national securities exchange – (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 USC §78a-10(b).  "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . b. To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . ."  17 CFR §240.10b-5.  "It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact in order to make the statements made, in light of the circumstances under which they were made, not misleading."   CA Corporations Code §25401.

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

knew that statements about a person's beliefs are facts and would be protected only when reasonably supported, made in good faith and honestly held.

3.85    On the basis of what Brennan read, heard and otherwise knew, he no longer believed that the Bank had a reasonable, good faith basis to say that it could achieve the events, outcomes and results depicted in the Third Updated Business Plan and he thought that the Bank's CFO, Stuedli, and many, if not all, of the non-management directors also no longer believed so.  Consequently, Brennan concluded that the Bank's statements in its offering documents no longer met the applicable legal standards for disclosure.   He believed his concerns were serious, well grounded and reasonable.  Moreover, he knew he could personally be subjected to potential civil and criminal sanctions for violating these laws and rules[8] if he did not act on his concerns, especially because he was the member of the Executive Committee responsible for the formulation of the Bank's long-term strategic and financial objectives.

### March 2 -12, 2012

3.86    Brennan concluded he had a moral responsibility and a legal duty to express those concerns.  He did so in an email sent to Royer, the Bank's General Counsel on Saturday, March 3, 2012.[9]  Brennan did not copy anyone on the email.

3.87    Later on March 3rd, Royer responded to Brennan by email, sending copies to Antin and Stuedli.[10]

3.88    Between March 4 and March 9, 2012, Brennan, Royer, Stuedli and Antin continued the email chain Brennan and Royer had started, exchanging numerous emails.[11]

---

[8] "Any person that knowingly provides substantial assistance to another person in violation of any provision of this division or any rule or order thereunder shall be deemed to be in violation of that provision, rule, or order to the same extent as the person to whom the assistance was provided."  CA Corporations Code §25403(b).

[9] **Exhibit 7 (Sealed)**

[10] **Exhibit 8 (Sealed)**

[11] **Exhibits 9-12 (Sealed)**

COMPLAINT
PAGE 40

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

3.89    On Friday, March 9, Brennan received an email from James Furey at Sandler O'Neill stating that a potential individual investor had contacted Sandler O'Neill and that they were finding out the details of how much he would like to invest.[12]    Brennan immediately forwarded Furey's email to Royer, Stuedli and Antin.[13]

3.90    At 4:50 a.m. PDT, Monday, March 12, 2012, Furey again emailed Brennan indicating that the individual investor would invest around $50,000 and asking Brennan "if this can get started."[14]

3.91    At 8:23 a.m. PDT, Brennan forwarded Furey's new email to Royer, Stuedli, and Antin.[15]

3.92    Antin promptly replied by email.[16]

3.93    An hour later Brennan sent an email to Antin, with copies to Royer, Stuedli, and another Patton Boggs attorney.[17]

3.94    By early the morning of March 12, Brennan believed – and had good reason to believe, and still believes – that information being communicated to potential investors contained statements of material facts that were inaccurate and omitted material facts that rendered them misleading, and that efforts to solicit potential investors for the remaining $85 million from the 2011 Offering should be stopped until that information was updated and corrected and a thorough analysis of the Bank's financial operations was completed. These inaccurate and/or omitted material facts included but were not limited to the following:

(1)    Projected loan volumes were used that were not supported by actual or

---

[12]  **Exhibit 13**
[13]  **Exhibit 14 (Sealed)**
[14]  **Exhibit 15 (Sealed)**
[15]  **Exhibit 15 (Sealed)**
[16]  **Exhibit 15 (Sealed)**
[17]  **Exhibit 16 (Sealed)**

COMPLAINT
PAGE 41

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

historical performance, nor did they include changes recently made by Gordon to loan and deposit pricing;

(2)    Neither the March 1 organic only model, nor the model discussed in the Third Updated Business Plan, projected the financial impact of early pay-offs or additional impairment of loans in the Bank's sizeable purchased impaired loan portfolio, which management and the Board knew were occurring and, although not capable of accurate prediction or estimation, would likely continue to occur and could materially impact the Bank's future results; and

(3)    A very significant part of the purchased multi-family loans originated in 2011 were referred by a single source and that this class of loans represented the majority of the Bank's 2011 organic loan growth.

3.95    Unbeknownst to Brennan, on the morning of March 12 Royer sent Gordon an email at 8:52 a.m. PDT[18]

3.96    At 11:23 a.m., Gordon forwarded Royer's email to Brennan[19], with a long message expressing in no uncertain terms his displeasure with Brennan, stating that he "did not include me in the email distributions, did not discuss with me your thoughts or worse, your rallied conclusions, and that some of the conclusions were reached based on a misrepresentation or misunderstanding of facts", which he proceeded to describe.   He claimed that Brennan "took it upon [himself] to speak with, and try to influence the thinking of, Patton Boggs", and ended by saying "Carey, I don't have a lot of time or patience these days to run around hand holding.  In the future, you need to vet these matters with me internally before running off and shooting out emails such as those discussed here. I found it quite annoying to have to spend time cleaning this up with Patton Boggs this

---

[18]  **Exhibit 17 (Sealed)**
[19]  **Exhibit 18**

COMPLAINT
PAGE 42

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

morning."

3.97     Brennan sent Gordon an email reply at 11:50 a.m. saying:  "Did Don provide you copies of my emails to him and Thea from over a week ago?  My initial email was sent to him and him alone . . .   He elected to speak with Norman [Antin] and copy Thea [Stuedli] and Norman on his reply."[20]

3.98     Additional emails were exchanged between Gordon, Brennan, and Royer through 2:30 p.m. that afternoon.[21]

3.99     Royer's actions on the morning of March 12 were inconsistent with all of his previous communications regarding the subject, both as to the substance of Brennan's concerns and the manner in which they should and would be addressed by management. Brennan was convinced that Royer's actions were an attempt to distance himself from the issues and avoid Gordon's criticism, and that Gordon was not appropriately evaluating the Bank's future prospects or its legal obligations to potential investors.

3.100    By the end of the week of March 12th, Brennan had heard nothing to confirm that the 2011 Offering was not going forward in its current state.  To the contrary, he had received a third email from Furey again asking how to proceed with selling Bank stock to the individual he had previously identified. Thus, Brennan believed – and had good reason to believe – that the placement agents were continuing to seek potential investors for the remaining $85 million from the 2011 Offering, and that the materially misleading materials in the online data room remained accessible to potential investors.

**Brennan's Diminished Functions and Responsibilities**

3.101    Some of the emails exchanged between Gordon, Royer and Brennan on March 12 referred to a meeting Royer had scheduled for Brennan later that week with an

---

[20]  **Exhibit 18**
[21]  **Exhibit 19 (Sealed)**

COMPLAINT
PAGE 43

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

1
2
3

outside attorney Royer had retained to represent the Bank in connection with what Royer called "the Jan Schrag matter."   Schrag was no longer employed at the Bank and had threatened the Bank with a wrongful termination action.

4
5
6
7
8
9
10
11
12
13
14
15

3.102  As stated *supra*, Gordon had hired Schrag as an SVP for the position of Deputy Director of Corporate Development, reporting to Brennan.  Schrag started work at the Bank immediately after the closing of the Bay Cities Transaction on October 1, 2010. She entered into a standard form SVP employment agreement with the Bank for a one-year term at a salary of $275,000 per year.  As with all SVP employment agreements, Schrag would be entitled to receive a severance payment equal to her annual salary if she were terminated by the Bank for any reason other than cause, or resigned for good reason.  Like Brennan, Schrag's home was in Washington State.  Her employment agreement provided that she could remain a resident of the state of Washington and would receive $2,500 per month as an allowance for housing accommodations in Orange County.  Her contract would automatically renew each year for an additional year unless she or the Bank notified the other to the contrary.

16
17
18
19
20
21
22
23

3.103  As planning for the integration of Cascade Bank progressed, Schrag volunteered to oversee and manage the six-person call center operated by Cascade in Everett, Washington and to assume management responsibility for the customer-facing components of the Bank's online banking platform, while continuing to report to Brennan and perform the role of Deputy Director of Corporate Development.  Brennan and Jill Barnes ("Barnes"), an EVP and President of Retail Banking, were supportive of Schrag taking on these additional responsibilities, as she had substantial experience managing these operations in her past employment.  Gordon approved it.

24
25
26

3.104  On September 7, 2011, Brennan received an email from Gordon informing Brennan that Gordon had decided not to renew Schrag's employment agreement with the

COMPLAINT
PAGE 44

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Bank.  In the email Gordon expressly stated that neither her title nor salary would change, and indicated that he assumed Brennan would inform Schrag of this information given the fact that she reported to Brennan.  This news came as complete surprise to Brennan.  Gordon had never even hinted to Brennan that he was considering the decision, and only learned later that Gordon had discussed it with the Board of Directors weeks before in an executive session.  Brennan immediately communicated this information to Schrag, including Gordon's assurances that her title and salary would not change.

3.105  During the next four months Schrag continued performing her work with Brennan as Deputy Director of Corporate Development, while spending much of her time on the planned systems conversion for the legacy online banking platforms of Bay Cities and Cascade Bank.

3.106  On Wednesday, February 1, 2012, Barnes asked Brennan if he had prepared an annual performance evaluation for Schrag.  The Bank's Human Resources ("HR") Department had recently initiated a newly-developed annual performance evaluation program and Brennan had, in fact, prepared and submitted to the HR Department an evaluation for Schrag for her work as the Deputy Director of Corporate Development, rating her as a four on five point scale with five being the most favorable rating.  Barnes informed Brennan that she had not prepared a performance evaluation for Schrag with respect to her management responsibilities for alternative delivery and the call center in Everett, and said she needed to do some "leadership" coaching with Schrag.  She said she planned to meet with Schrag the following week during a trip she had planned to Everett.  That evening, Brennan sent Barnes an email offering his further assistance regarding her upcoming conversation with Schrag.  Barnes responded on Thursday, February 2 that "she would start the dialogue with [Schrag] next week.  I will let you know how it goes.  I appreciate partnering with you on this."  Later that day Brennan and Barnes again discussed

COMPLAINT
PAGE 45

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Schrag briefly.

3.107   Instead of "partnering" with Brennan, on Monday, February 6, 2012, Barnes called Brennan to tell him that she would be having a difficult conversation with Schrag very shortly to inform her that her annual salary was being cut from $275,000 to $135,000 effective almost immediately.  A conversation then ensued between Barnes and Brennan during which Barnes said that Schrag's job now was to run a six-person call center and that she could not justify paying more than $135,000 for a call center manager; asked Brennan what he thought Schrag would do and if he thought Schrag would quit; and said that if she were in Schrag's shoes, she would quit.  Brennan told Barnes he would not speculate whether Schrag would stay or resign.  He asked Barnes if she knew that only a few months before, Gordon had assured him and he had assured Schrag that her annual salary would not change.  Barnes said she was not aware of those facts but she had already spoken with Gordon and he had approved the change.

3.108   Less than ten minutes after ending his call with Barnes, Brennan received a call from Schrag who informed him of not just her huge cut in salary but something Barnes had not told him:  if Schrag quit, she would receive no severance.  Brennan expressed his disagreement with this decision – about which he should have been, and was not, consulted – in an email he sent to Gordon at 3:33 p.m. on February 6, recommending that Schrag be offered the alternative of leaving the Bank and receiving severance, and reminding Gordon that he had given Brennan assurances the previous September that Schrag's salary would not change, assurances Brennan had communicated to Schrag.[22]

3.109   On February 10, Brennan had to tell Schrag he did not know whether she was also losing her title as SVP, Deputy Director of Corporate Development.  He did not even know whether the Bank was going to hire another Deputy Director within his

---

[22] **Exhibit 20 (Sealed)**

COMPLAINT
PAGE 46

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Corporate Development department.

3.110   Brennan's subsequent communications with Gordon and Royer about Schrag included an email exchange with Royer on February 13, 2012.[23]

3.111   On February 17, Schrag emailed a letter of resignation to Opus executives, copying Brennan.  Brennan did not respond to Schrag's email or letter, instead forwarding them to Royer.

3.112   At Royer's request, Brennan located a number of emails regarding the Bank's decision in September 2011 not to renew Schrag's employment agreement and forwarded them to Royer via emails sent on February 19, 2012.[24]

3.113   Ms. Schrag resigned from the Bank and promptly retained a Seattle attorney, who informed Opus that he was going to pursue a wrongful termination claim against the Bank.  On information and belief, Opus recently paid Ms. Schrag a substantial sum of money in return for her agreement not to sue the Bank.

3.114   Brennan's inability to prevent the Bank's mistreatment of his Deputy Director was not an anomaly, because for the previous several months he began to be excluded from many of the activities he had been hired to perform.  While he was heavily involved in communications with the investment bankers and the Cascade Bank CEO during that acquisition, he had far less involvement in the subsequent Fullerton Bank acquisition.   Where Gordon would previously brainstorm possible acquisitions with Brennan on a regular basis, and they would routinely make joint telephone calls to a potential target's executives and investment advisers, beginning in the later half of 2011 and into 2012 Brennan would learn of potential acquisitions only after Gordon had spoken with the CEO or Board members of the bank that might be acquired, frequently learning of

---

[23]   **Exhibits 21 and 22 (Sealed)**
[24]   **Exhibits 23-28 (Sealed)**

COMPLAINT
PAGE 47

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

them first from his staff in the Corporate Development department who Gordon had contacted to request information concerning the targets.

3.115   Brennan continued to analyze numerous additional bank candidates, as well as equipment leasing companies, but found it increasingly difficult to evaluate acquisition candidates because Gordon relied on his intuitive beliefs about the merits of an acquisition, without analyzing pertinent market data and due diligence information and findings.

3.116   Although Brennan was supposed to be "responsible for the formulation of Opus Bank's long-range strategic and financial objectives and execution of the bank's growth strategy" as described in the Bank's December 15, 2010 news release, Gordon began dismissing or rejecting Brennan's fact-based analyses of the Bank's current and future financial condition, instead ordering Stuedli to prepare models based on Gordon's unsupported projections.  Gordon would frequently relegate mundane tasks to Brennan that were not "customary, appropriate and reasonable executive duties as are normally assigned to a person with such position at other similarly situated banks", as called for in Brennan's Employment Agreement with the Bank.

3.117   And, as stated earlier, by March 2012 Brennan had legitimate concerns that the Bank was trying to sell its stock using materially inaccurate financial representations and projections.

### Notice of Termination of Employment with Good Reason

3.118   Brennan decided that he could no longer participate in or provide assistance with the Bank's capital raising endeavors, particularly the 2011 Offering, or continue as an officer of the Bank.  Brennan concluded that these events, along with other circumstances occurring over the course of his tenure with the Bank including the diminution of his responsibilities, constituted "Good Reason" as defined in his employment agreement.  Before he delivered the Notice of Termination for Good Reason pursuant to Sections 9(c)

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

and 15 of his employment agreement (the "Notice"), Brennan offered to discuss his concerns with Gordon but Gordon refused to meet with him without Royer being present, making it clear to Brennan that Gordon viewed him as an adversary, when all he was trying to do was fulfill his legal and fiduciary duties to the Bank and to perform the services Gordon had hired him to perform.

3.119  Early on the morning of March 19, 2012, Brennan sent to Gordon and the remainder of the members of the Opus Board of Directors the six-page Notice.[25]  The Notice described the events constituting Good Reason, including, that (1) "[w]ithout my consent and with no discussion with me, [Gordon] has materially eroded and changed the scope and significance of my duties"; and (2) "[w]ithout my consent, my duties, responsibilities and function have been further materially changed and diminished, . . ." stating that these circumstances also constituted a material breach of Brennan's employment agreement by the Bank.  Consistent with the requirements for notice set forth in Section 9(c) of Brennan's employment agreement, the Notice described in significant detail numerous examples of these events, including those discussed *supra*, as well as Brennan's securities law compliance concerns and Gordon's refusal to properly address them.

**The Bank Rejects Brennan's Notice of Termination**

3.120  The Notice stated that, pursuant to the requirements in Section 9(c) of Brennan's employment agreement, the termination for Good Reason would become effective only if each event giving rise to Good Reason was not cured by the Bank within 30 days after the Bank's receipt of the Notice.  During the 30-day cure period, Brennan's employment with the Bank as an EVP and Director of Corporate Development was to continue under his employment agreement and Brennan intended to perform his job duties

---

[25]  **Exhibit 29**

COMPLAINT
PAGE 49

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

throughout that period.

3.121   However, less than three hours after he delivered the Notice on March 19, Brennan was blocked from accessing his Opus Bank email and the Opus computer system and, accordingly, was unable to perform his job.  He promptly sent an email to Royer from his personal email account informing him of this action.  Later on March 19, with no time or opportunity for the Bank's Board of Directors to conduct an impartial investigation into any of the matters in the Notice, Royer responded to Brennan by sending an email stating "Suffice here to say, **Opus Bank does not** accept or **agree** with your recitation of the events or the examples you characterize as constituting 'Good Reason' under your Employment Agreement." (emphasis added)[26]  Then, describing what Royer characterized in his email as Brennan's "recent aberrant behavior," he informed Brennan:

> . . . based **on a decision made today by Stephen Gordon**, given the nature of your recent communications with Senior Management and your refusal to attend scheduled Executive Management Committee meetings last week, and your failure to attend a meeting I requested you to attend with local retained counsel (subsequently rescheduled and which you later did attend), on a litigation related matter involving another employee of Opus Bank, you are being effective today, placed on administrative investigatory suspension, with pay and pending completion of our internal investigation into the matters at hand. (emphasis added)

3.122   Two days later, on March 21, 2012, Royer sent a second email to Brennan, stating that on March 27 the Bank's Board of Directors would review the issues raised by Brennan in his Notice, and would also consider whether Cause (as defined in Brennan's employment agreement) existed to terminate Brennan's employment, specifically in light of six meetings between March 8 and March 15 that Brennan allegedly failed to attend.[27]

---

[26] **Exhibit 30**
[27] **Exhibit 31**

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Royer invited Brennan to provide the Board with "the reasons and justification that you believe may exist for you not attending" those meetings before the Board's March 27 meeting, stating "[t]hese Executive Management Committee meetings are important events, in which you are required to actively participate as an Employee under your Employment Agreement."   Brennan's employment agreement says nothing about his participation in meetings of the Bank's Executive Committee (Royer got the name of the committee wrong) or any other committee of the Bank.

      3.123   On March 26, 2012, Brennan sent Royer and the members of the Board a seven-page, single-spaced letter that described in greater detail the reasons for his concerns that the Bank was violating securities laws and regulations and the other circumstances supporting his claim that Good Reason existed, and addressed each of the events described in Royer's email as giving rise to Cause for Good Reason.[28]   He also informed the Board that these continuing actions by Gordon constituted blatant retaliation and further and additional events of Good Reason and breaches of his employment Agreement.   With respect to the alleged missed meetings, Brennan's letter reported:

| Date | Event | Brennan Response |
|------|-------|------------------|
| 03/08/12 | EMC meeting | Brennan attended the meeting. |
| 03/09/12 | EMC meeting | The time of meeting was changed, Brennan had a conflict, and at Gordon's request spent the time updating due diligence materials concerning a possible acquisition. |
| 03/12/12 | Meet Bank counsel | The meeting was rescheduled for 03/15 regarding Schrag, which Brennan attended. |

---

[28]  **Exhibit 32**

COMPLAINT
PAGE 51

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

| Date | Event | Brennan Response |
|------|-------|------------------|
| 03/12/12 | Brennan cancelled his scheduled trip to Irvine | This was a trip that Brennan would have taken for an unrelated Bank matter that did not materialize. There was therefore no reason for Brennan to fly to Irvine. |
| 03/13/12 | EMC meeting | This was a non-mandatory meeting that Brennan chose not to attend while he was considering his response to Gordon's 03/12 emails. |
| 03/15/12 | EMC meeting | Brennan's meeting with Opus counsel regarding Ms. Schrag was rescheduled twice, ultimately conflicting with his attendance at this non-mandatory meeting. |

3.124   On March 29, 2012, ten days after Brennan was cut off from communicating with his staff and colleagues at the Bank and was told he had been put on "administrative supervisory suspension" by Gordon and that the Board would be considering terminating him for cause, Royer sent an email to the Bank's EVPs and SVPs to inform them that Brennan "is out on an administrative leave" and all business matters involving Brennan should be directed to Royer.  There was no mention in the email that Brennan had given the Bank a Notice of Termination for Good Reason.

3.125   At 5:43 p.m. on April 2, 2012, the 14th day after Brennan delivered the Notice and having had no communication from Opus since March 21, Brennan received an email from R. Craig Scott stating, "I am an independent outside investigator looking at [Brennan's] employment relationship with Opus Bank."   It was not until April 4 that Brennan was able to get Royer to confirm that the Bank had retained Mr. Scott.

3.126   At Mr. Scott's request, on April 4, Brennan participated in a telephonic interview conducted by Mr. Scott in which Brennan's attorney, Thomas Klein, also participated by telephone.

3.127   Mr. Scott's demeanor and questions during the interview more closely

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

resembled an adversarial deposition or cross-examination than a neutral fact finder.  On April 6, Mr. Klein sent Mr. Scott a letter accurately describing many of the improper tactics employed by Mr. Scott during his "interview" of Brennan.[29]

3.128  On April 18, 2012, the final day of the 30-day cure period required under Brennan's employment agreement, Sanchez, with whom Brennan had no prior communications regarding any of these matters, sent Brennan a letter, in which he stated that Mr. Scott had been retained to "perform an independent investigation of the matters raised by Brennan's Notice of Termination."[30]  Sanchez stated that Mr. Scott had completed his "independent investigation" after interviewing "members of Opus Bank's senior management team" along with Brennan.  Sanchez informed Brennan that the Opus Board "has accepted and has adopted the conclusions reached by [Mr. Scott]", which were that no "Good Reason" existed for Brennan to submit his Notice of Termination, the Bank had no Cause to terminate Brennan, and the Bank did not materially breach the Employment Agreement.

3.129  Sanchez concluded the letter by stating:  " . . . because there is neither 'Good Reason' nor any 'event' to cure, Opus Bank's Board of Directors hereby recognizes that you have chosen to terminate your employment with Opus Bank effective April 18, 2012."  Included with the letter from Sanchez was a letter to Brennan from Kim Luce, the Bank's Director of HR, stating:  "Your voluntary resignation from Opus Bank has been accepted and is effective April 18, 2012."

3.130  Between March 19, 2012, the date Brennan delivered the Notice to Gordon and the other members of the Board of Directors, and April 18, 2012, the last day of the 30-day cure period and the date on which Sanchez and Luce informed Brennan of the Bank's

---

[29] **Exhibit 33**
[30] **Exhibit 34**

COMPLAINT
PAGE 53

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

unilateral decision to treat the Notice as a voluntary resignation, Gordon had notified the remaining employees in Brennan's Corporate Development department that their positions were being eliminated, but only after the Bank's severance policy had been restated causing the severance benefits payable to these individuals to be substantially reduced.

3.131  On April 26, 2012 Bruce Genderson, an attorney from Washington, D.C. representing Brennan, sent Royer a letter, expressing his disagreement with the Bank's response to Brennan's Notice, and requesting compensatory damages and the production of all documents pertaining to Mr. Scott's investigation.[31]

3.132  On May 7, 2012 David A. Wimmer, an attorney from Beverly Hills, California representing Opus, sent Brennan's California attorney, Thomas Klein, a letter, responding to Mr. Genderson's letter.  On behalf of Opus, Mr. Wimmer declined to pay any of the compensatory damages requested by Mr. Genderson (although he requested for review documentation of Brennan's alleged unreimbursed business expenses) and did not produce any of the documents regarding Mr. Scott's investigation.[32]

3.133  Mr. Klein responded to Mr. Wimmer by letter dated May 11, 2012, renewing the request for Mr. Scott's documents, instructing Opus to preserve and maintain all documentation potentially related to Brennan's claims against the Bank, and producing documentation supporting Brennan's claims for unreimbursed business expenses.[33]

3.134  Opus subsequently paid Brennan for his documented unreimbursed business expenses. It continued to refuse to produce any documents pertaining to Mr. Scott's investigation.

3.135  As stated *supra*, by March 1, 2012 Brennan was no longer being allowed to provide those services to Opus Bank that were outlined in his Employment Agreement and

---

[31] **Exhibit 35**

[32] **Exhibit 36**

[33] **Exhibit 37**

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

described in the December 15, 2010 press release.  His role in "formulati[ng] Opus Bank's long-range strategic and financial objectives and execution of the bank's growth strategy" had been usurped by Gordon's focus on his unsupported and unrealistic growth projections instead of Brennan's fact-based analysis of the Bank's current financial condition and projected growth.  Brennan was also no longer significantly involved in working with the Bank's executive team to "(i) source and screen potential acquisition targets, (ii) conduct business and financial due diligence, (iii) determine appropriate valuation and deal structure, negotiate terms, (iv) drive activities to closure, and (v) effectuate an efficient and timely post-close integration process."  Gordon was pursuing many of those activities without Brennan.  Moreover, by March 1, 2012, the Bank's Board was strongly urging Bank management to focus on growing "organically" – by managing the Bank's current assets, personnel, income, and expenses more efficiently – than by acquisitions, which was the primary reason Brennan was hired in the first place.

3.136  Also, as stated *supra* and in his Notice, by March 1, 2012 Brennan was concerned, and had good reason to be concerned, that documents the Bank was using to solicit prospective investors to purchase shares of the Bank's stock contained disclosures that were materially inaccurate and/or misleading.

3.137  Between March 3, 2012 – when Brennan sent his first email to Royer – and March 18, 2012, Brennan received no indication of any kind whatsoever that Gordon intended to take, or had taken, any material action to address any of those concerns.  By March 18, Brennan believed, and had good reason to believe, that he would continue to be only minimally involved in those duties and responsibilities for which he was hired, and that materially misleading information regarding the Bank's current financial condition or at least its current ability to achieve its projected growth was still being made available to potential investors in violation of federal and state securities laws.

COMPLAINT
PAGE 55

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

3.138  Pursuant to ¶9(c) of Brennan's employment, Brennan's Termination with Good Reason was to be effective "only if (i) each event giving rise to Good Reason is not cured within thirty (30) days after the Bank's [March 19] receipt of such notice . . ."

3.139  After submitting his Notice on March 19, 2012 Brennan was still an employee of the Bank and was ready, willing, and able to continue performing his duties. Nevertheless, without factual, contractual, or other legal basis the Bank immediately rendered him unable to do so, effectively terminating him while ostensibly placing him on "administrative investigatory suspension" allegedly due to Brennan's (unspecified but totally appropriate) "recent communications with Senior Management" and "refusal or failure to attend scheduled Executive Management Committee meetings" (one of which Brennan actually attended, the others he was excused from or otherwise not required to attend).

3.140  At no time between March 19 and April 18, 2012 (or, for that matter, through the date of this Complaint) did Gordon, Royer, Stuedli, or anyone else from or on behalf of the Bank provide Brennan with any information indicating that any steps of any kind had been undertaken to address any of the concerns expressed by Brennan, Stuedli, representatives of Sandler O'Neill, or members of the Bank of Directors described herein.

3.141  Sanchez' April 18, 2012 letter contains no discussion or explanation whatsoever regarding the basis for the Bank's conclusions (which appear to be based totally on Mr. Scott's "factual findings and conclusions" following his "independent investigation of the matters raised by Brennan) that "there is no event giving rise to 'Good Reason'", the Bank did not materially breach the Agreement, and that "no securities law violation exists."

3.142  Opus unlawfully refused appropriate requests by Brennan's attorneys to produce any documents pertaining to Mr. Scott's investigation.  However, based on Mr.

COMPLAINT
PAGE 56

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

Scott's conduct during his interview of Brennan and his alleged findings and conclusions, on information and belief Mr. Scott's investigation was not conducted in a fair, reasonable, thorough, or objective manner.

3.143   Furthermore, and for the same reasons, on information and belief Mr. Scott's findings and conclusions described in Sanchez' April 18, 2012 were unsupported and erroneous.

3.144   The events described in Brennan's Notice constituted Good Reason as defined in Brennan's Employment Agreement.

3.145   On information and belief, all or at least a substantial number of the events giving rise to Good Reason as described in Brennan's Notice were not cured by Opus by April 18, 2012.

3.146   In his April 18, 2012 letter to Brennan, Sanchez said, "Opus Bank's Board of Directors hereby recognizes that you have chosen to terminate your employment with Opus Bank effective April 18, 2012."   In fact, Opus chose to terminate Brennan in retaliation for Brennan giving the Notice and elevating the matters discussed therein to the Board of Directors, and by refusing to cure those matters that constituted Good Reason for the termination of Brennan's employment by Opus without cause.

3.147   The Defendants' breach of Brennan's employment agreement and unlawful termination of his employment with Opus Bank has caused significant monetary damages to Brennan, including but not limited to:

- A lump sum cash severance payment of at least $1,298,419.56 (an amount equal to three times the sum of Mr. Brennan's annual base salary plus Brennan's estimate of Opus Bank's contributions to its group term life insurance and 401(k) plans on his behalf in 2011);

- The loss caused by the Bank's failure to accelerate vesting in full of

COMPLAINT
PAGE 57

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

all of Brennan's 148,659 unvested stock options which – using the Bank's initial option value of $7.47 per share – would have an aggregate value of $1,110,483; and of Brennan's 76,942 shares of restricted stock, which – using the Bank's then common stock offering price of $20 per share –would have an aggregate value of $1,538,840; and

- Damages for the Bank's failure to continue to maintain life, medical, dental and disability insurance coverage for Mr. Brennan and his dependents for the remaining 32 months of the Employment Agreement, as previously extended.

### IV.  CAUSES OF ACTION

**First Cause of Action:  Breach of Contract**

4.1    Brennan repeats and renews each of the aforementioned factual allegations.

4.2    Defendant Opus Bank's acts and omissions constituted a breach of its December 3, 2010 Employment Agreement with Brennan ("the Employment Agreement") under both California and Washington law.

4.3    Defendant Opus Bank shall pay all damages to Brennan as described *supra* and as called for in the Employment Agreement, together with Brennan's attorneys' fees and costs incurred herein.

**Second Cause of Action:  Breach of Implied Covenant
of Good Faith and Fair Dealing**

4.4    Brennan repeats and renews each of the aforementioned factual allegations.

4.5    Defendant Opus Bank's acts and omissions constituted a breach of its implied covenant of good faith and fair dealing in its implementation of the Employment Agreement under both California and Washington law.

4.6    Defendant Opus Bank shall pay all damages to Brennan as described *supra* and as called for in the Employment Agreement, together with Brennan's attorneys' fees and costs incurred herein.

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

1

### Third Cause of Action:  Tortious Wrongful Termination
### In Violation of Public Policy

2       4.7     Brennan repeats and renews each of the aforementioned factual allegations.

3       4.8     Defendant Opus Bank's acts and omissions constituted tortious wrongful

4  termination of Brennan in violation of public policy under California and Washington law.

5       4.9     Defendant Opus Bank shall pay all damages to Brennan as described *supra*

6  and as called for in the Employment Agreement, together with tortious and punitive

7  damages in an amount to be determined along with Brennan's attorneys' fees and costs

8  incurred herein.

9

### Fourth Cause of Action:  Violation of California Labor Code §1102.5(c)

10      4.10    Brennan repeats and renews each of the aforementioned factual allegations.

11      4.11    California Labor Code §1102.5(c) states:  "An employer may not retaliate

12  against an employee for refusing to participate in an activity that would result in a violation

13  of state or federal statute, or a violation or noncompliance with a state or federal rule or

14  regulation."

15      4.12    Defendant Opus Bank's acts and omissions violated California Labor Code

16  §1102.5(c).

17      4.13    Defendant Opus Bank shall pay all damages to Brennan as described *supra*

18  and as called for in the Employment Agreement, together with tortious and punitive

19  damages in an amount to be determined along with Brennan's attorneys' fees and costs

20  incurred herein.

21

### Fifth Cause of Action:  Violation of RCW 49.52.070

22      4.14    Brennan repeats and renews each of the aforementioned factual allegations.

23      4.15    RCW 49.52.050(2) states that "[a]ny employer or officer, vice principal or

24  agent of any employer . . . who (2) [w]illfully and with intent to deprive the employee of

25  any part of his or her wages, shall pay any employee a lower wage than the wage such

26

COMPLAINT
PAGE 59

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

employer is obligated to pay such employee by any statute, ordinance, or contract; . . . [s]shall be guilty of a misdemeanor.

4.16   RCW 4.52.070 states that any "[a]ny employer and any officer, vice principal or agent of an employer who shall violate any of the provisions of RCW 49.52.050(1) and (2) shall be liable in a civil action by the aggrieved employee . . . to judgment for twice the amount of the wages unlawfully rebated or withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees; . . ."

4.17   Defendant Opus Bank willfully and with intent to deprive Brennan of monies due him under the Employment Agreement unlawfully terminated that Agreement and then failed to pay him the monies due him under that Agreement.  Opus is liable to pay Brennan twice that sum, together with Brennan's attorneys' fees and costs incurred herein.

4.18   Defendant Stephen Gordon, as the Chief Executive Officer of Opus Bank, had the authority to decide, and did decide, to willfully and with intent to deprive Brennan of monies due him under the Employment Agreement unlawfully terminated that Agreement and then failed to pay him the monies due him under that Agreement.  Gordon is – with Opus Bank – jointly and severally liable to pay Brennan twice that sum, together with Brennan's attorneys' fees and costs incurred herein.

### Sixth Cause of Action: Violation of RCW 49.48.010

4.19   Brennan repeats and renews each of the aforementioned factual allegations.

4.20   RCW 49.48.010 states that "[w]hen any employee shall cease to work for an employer, whether by discharge or by voluntary withdrawal, the wages due him or her on account of his or her employment shall be paid to him or her at the end of the established pay period: . . ."

4.21   Defendant Opus Bank's acts and omissions violated RCW 49.48.010.

COMPLAINT
PAGE 60

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

4.22   Defendant Opus Bank shall pay all damages to Brennan as described *supra* and as called for in the Employment Agreement, together with Brennan's attorneys' fees and costs incurred herein.

## V.  LITIGATION INSTEAD OF ARBITRATION

5.1   Brennan repeats and renews each of the aforementioned factual allegations.

5.2   All six causes of action asserted herein shall be resolved by litigation, rather than arbitration, despite the provisions to the contrary in §16 of the Employment Agreement.

5.3   At least with respect to its dispute resolution provision, said Agreement is procedurally unconscionable.  Opus presented the Agreement to Brennan on a "take it or leave it basis".  He was not allowed to dispute, negotiate, or amend any of its structural provisions, including but not limited to §16's requirement that "any controversy or claim arising out of this Agreement or the Employee's employment with the Bank or the termination thereof, . . ." be resolved by binding arbitration.

5.4   Section 16 of the Agreement is also substantively unconscionable, particularly with respect to the requirement that "[a]ny arbitration initiated pursuant to these provisions shall be on an expedited basis and the dispute shall be heard within one hundred twenty (120) days following the service of the notice of arbitration . . ."

5.5   Since Brennan provided the Bank with lengthy and specific explanations of reasons why he believed Good Reason existed, the Bank will need to conduct very little discovery to prepare for arbitration or trial.  Conversely, since the Bank refused to provide Brennan with any information regarding Scott's investigation, or the basis for its conclusions that no Good Reason existed and the Bank had not breached the Agreement, Brennan will have to undergo very extensive discovery, including requests for numerous documents and depositions of many individuals, that almost certainly will not be able to be

**THE HUNSINGER LAW FIRM**
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

completed within 60 days.

5.6     The Agreement is also substantively unconscionable because it expressly grants injunctive and other equitable relief to the Bank[34] but not to Brennan.

5.7     Moreover, the Agreement is manifestly substantively unconscionable if at the time Gordon presented it to Brennan for signature, he and Opus intended that Sections 9(a), (b), and (c) would permit the Bank to respond to a Notice of Good Reason in the manner in which it actually responded to Brennan's Notice as described *supra*.

5.8     Finally, the Bank waived its right to arbitrate this dispute by the manner in which it responded to Brennan's Notice of Good Reason.

5.9     Section 18(g) of the Agreement provides that its provisions "shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof."

5.10    The mandatory arbitration provisions of §16 of the Agreement are invalid and unenforceable, but do not render invalid other provisions therein.

## VI.  RELIEF

Plaintiff Carey Brennan requests the following relief:

1.      A judgment against Defendant Opus Bank for compensatory, tortious, and exemplary damages in an amount to be proven at trial, together with all attorneys' fees and costs he has incurred herein;

2.      A judgment against Defendant Stephen Gordon, jointly and severally with Defendant Opus Bank, for twice the amount due Brennan under the terms of the Employment Agreement, together with all attorneys' fees and costs he has incurred herein; and

3.      For all other relief which this Court deems to be just and equitable.

---

[34]  §8

COMPLAINT
PAGE 62

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178

1

**VII.  JURY DEMAND**

2      7.1     The Plaintiff requests that this matter be heard by a jury.

3      Dated this 16th day of January, 2013.

4

5                                    By:___ s/Michael D. Hunsinger          __
                                            MICHAEL D. HUNSINGER
6                                           WSBA NO. 7662

7                                    THE HUNSINGER LAW FIRM
8                                    100 South King Street, Suite 400
                                     Seattle, WA  98104
9                                    Telephone:      206-624-1177
                                     Fax:            206-624-1178
10                                   E-mail:  mike_hunsingerlawyers@yahoo.com
11                                            mike@hunsingerlawyers.com
                                     Attorneys for Plaintiff
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

COMPLAINT
PAGE 63

THE HUNSINGER LAW FIRM
The Westland Building
100 South King Street, Suite 400
Seattle, WA  98104
(206) 624-1177
FAX (206) 624-1178